## Affidavit of Steven Raimi

1. I am over the age of 18 years and if sworn as a witness I am competent to testify about the matters set forth herein based on personal knowledge except where the matter is indicated to be based on information and belief.
2. I reside at 3309 Bacon Avenue, Berkely, Michigan
3. I am a member of the American Civil Liberties Union.
4. I am a registered voter in Michigan.
5. On November 5, 2024, I served as a poll watcher on behalf of the nonpartisan organization Election Protection.
6. As part of my shift, I visited and poll-watched at four polling locations. This included two polling locations in Oakland County, Michigan, Derby Middle School, located at 1300 Derby Rd, Birmingham, MI 48009, and Oakland Schools Technical Campus Southeast, located at 5055 Delemere Ave, Royal Oak, MI 48073.
7. At around 2:00 p.m., I arrived at Derby Middle School and saw police officers leaving and three men on the sidewalk, with whom the police had evidently been dealing. The men had cameras and were filming individuals going into and out of the polling station.
8. One of the three men, who was tall and thin, was wearing a baseball cap that said something like "DON'T ANNOY ME, I'M AN ASSHOLE. MY RIGHTS DON'T STOP WHERE YOUR FEELINGS START."
9. The other two men, including one who was burly and bearded, were wearing stars-and-stripes-themed clothing.
10. I said to the three of them that they could not film people coming in and out of a polling location, and they responded that it was their First Amendment right to film, nobody has an expectation of privacy in public, and that they were thus free to record whatever they wanted. This response appeared to be scripted.
11. After the three men left, I spoke with people passing out flyers near the polling station. These people informed me that the men had recently blocked a family from leaving the polling station. The family had insisted that the men not record them, and the men had given the family the same scripted response about their First Amendment right to record. The family was eventually allowed to leave, after one family member asserted "I'm

protecting my family." The people further informed me that the men were going from precinct to precinct to film.

12. I took a photograph, from a distance, of one of these men, who was the last to leave Derby. That photograph is attached as Exhibit A to this affidavit.
13. I then left Derby, and I went to Oakland Schools Technical Campus Southeast.
14. When I arrived, I sat in the polling station poll watching.
15. The last of the three men to leave Derby then arrived with three other individuals, one man and two women. To me, they appeared intimidating.
16. The individuals had cameras, including ones with external grips on either side, and were filming the polling location.
17. The last man to leave Derby was now wearing a stars-and-stripes gaiter that covered his nose and mouth.
18. Although the precinct supervisor instructed the individuals to halt their filming, the individuals responded with the same scripted response about their First Amendment right to record.
19. When the supervisor asked them what organization they were with, these individuals responded that they were "independent."
20. I recorded a portion of the argument between the precinct supervisor, who was visibly agitated, and these individuals.
21. The last man to leave Derby recognized me from our conversation at Derby, and I reminded him that he should not be filming the polling location and the voters in it. He again responded with the scripted response about his First Amendment right to record.
22. To remove myself from the situation, I left to file a report with Election Protection in my car. While I was in the parking lot, the police arrived.
23. As the police walked inside the building, I stuck my head out of my car window and offered to give them a witness statement.
24. Ten to fifteen minutes after the police arrived, the individuals who had been filming inside the polling station exited the building. As they walked past my car, I heard one of them say "It's expected, but still disappointing."
25. Ten minutes later, the police exited the building.

26. I then saw that two of the individuals who had been filming were still outside the polling station, and they were filming the movements of the police as they departed.
27. Upon information and belief, the six individuals I interacted with at Derby Middle School and Oakland Technical were a part of an organized effort to invite negative responses or anger from poll workers and voters and to capture those responses on video.
28. Due to time pressure, I was not able to give this statement in person and therefore was not able to sign a physical copy. I authorize Hassan Ahmad, an attorney who took this statement, to sign on my behalf.

I, Hassan Ahmad, swear and affirm that I took this statement from Steven Raimi, read it back to him word for word, and he confirmed its accuracy.

_____
Hassan Ahmad

Affirmed before me this  5  day of  Nov.  , 2024 at  Detroit, MI  .
Notary public, State of Michigan, County of  Wayne  .
My commission expires on  May 3, 2031  .

Kathryn Haroney
Notary Officer Administering Oath

```
KATHRYN HARONEY
Notary Public, State of Michigan
County of Wayne
My Commission Expires May 3, 2031
Acting in the County of  Wayne
```

IN THE UNITED STATES DISTRICT COURT
FOR THE _____ DISTRICT OF MICHIGAN
_____ DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN, on behalf of itself and its members, <br><br> Plaintiff, <br><br> v. <br><br> DOES 1—6, <br><br> Defendants. | Civ. No. _____ <br><br><br> **AFFIDAVIT OF LOREN KHOGALI** |

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I am a 48-year-old person who lives in Plymouth, Michigan. I am competent to make this declaration.

2. I currently serve as Executive Director of the American Civil Liberties Union of Michigan ("ACLU"). I am lawfully registered to vote in Michigan, and I have been a member of the ACLU for approximately 20 years.

3. Established in 1959, Plaintiff ACLU is a domestic, nonpartisan and nonprofit corporation organized for the civic, protective, or improvement purpose of protecting rights guaranteed by the United States and Michigan Constitutions. The mission of the ACLU is to realize the promise of the Bill of Rights for all citizens and expand the reach of its guarantees to new areas through public education, advocacy, and organization.

4. Today, the ACLU has 31,504 Michigan members, and provides support to members across Michigan, including 7,263 in Oakland County, 262 in Birmingham,

Michigan, and 914 in Royal Oak.

5. The ACLU seeks to ensure an easy and equal right to vote for every citizen and encourages its members and the people of Michigan to exercise their right to vote. The ACLU dedicates substantial time, effort, and resources to voter education and the protection of voting rights. These efforts include educating voters about state and federal laws protecting their right to be free from intimidation at the polls, preventing voters from being unlawfully challenged or otherwise prevented from voting or burdened when voting, and providing election inspectors with guidance regarding how to lawfully eject persons who engage in unlawful voter intimidation from polling locations.

6. To further our mission to encourage informed and active participation in government, we offer several critical services to Michigan voters on Election Day and in the early voting period. Some of the key services that we offer include coordinating an extensive multi-year project to provide support and information to election clerks throughout the state, making educational materials available to voters, staffing a voter protection hotline, litigation regarding a wide range of voter protection issues, and educating new and experienced voters about their polling locations and voting requirements.

### A. Impact of Intimidation on ACLU's Members

7. The ACLU has 7,263 members in Oakland County, Michigan, 262 in Birmingham, Michigan, and 914 in Royal Oak, Michigan, all locations where voter intimidation took place on November 5, 2024. ACLU members are high propensity voters, almost all of whom are well known to vote in major elections such as the one occurring today.

8. We have been informed by two different witnesses, one voter and one poll

monitor, that a group of approximately 6 individuals (four men and two women) has been visiting multiple polling locations in Oakland County, in particular at least two polling stations in Birmingham and at least one in Royal Oak, and entering buildings where polling is going on and filming voters coming and going against their will. This conduct includes following voters to their cars while filming them, and refusing to stop filming when asked. Voters have been sufficiently intimidated that they have sought to escape the polling station through alternate paths.

9. We are informed that the individuals who engaged in this surveillance and voter harassment were clad in assorted patriotic paraphernalia, and at least one was wearing an American flag gaiter covering his face. None of these individuals voted at these polling stations or indicated that they were present to vote. To the contrary, they asserted a right to be present filming voters.

10. It is not known what polling station these individuals might go to next, but ACLU members are spread throughout Oakland County.

11. Defendants' intimidating conduct threatens any ACLU members who are planning to vote in the relevant jurisdictions in Oakland County this evening and who may be too scared to vote or suffer intimidation while voting.

### B. Impact of Intimidation on the ACLU

12. Voter intimidation is antithetical to the ACLU's mission to encourage informed and active participation in government.

13. To respond to the voter intimidation that took place in Oakland County, the ACLU has had to divert critical Election Day resources from encouraging Michigan residents to vote and ensuring that they have the proper resources to do so toward protecting Oakland County residents from voter intimidation instead. The ACLU employs five organizers and a field director focused

on voter protection, four attorneys who regularly work on voting rights matters, as well as communications staff and other professionals, all of whom have been focused for years, including on Election Day, on encouraging voter turnout and working with governmental officials throughout Michigan to ensure a smooth-running election that is free of any unnecessary barriers to voting. The ACLU has expended millions of dollars on these efforts. Defendants' actions are actively diverting ACLU staff resources and undermining months of effort to promote voter turnout.

14. In particular, the ACLU's Election Protection Team has diverted its resources to ensuring that the voter intimidation that occurred at Royal Oak and Birmingham is appropriately documented and resolved, rather than focusing on their primary tasks of liaising with voters, poll workers, election challengers, and clerks throughout the state of Michigan to ensure a smooth-running election and staffing 866-OUR-VOTE, a non-partisan voter protection hotline. These resources would otherwise all be directed toward the ACLU's Election Day initiatives that are designed to maximize voter participation.

15. Shifting our resources to address this voter intimidation requires us to reduce the amount of volunteers and financial resources that we could use toward our core Election Day services for voters.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 5, 2024

/s/ Loren Khogali

GIANCARLO J GUZMAN
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 30, 2030
Acting in the County of WAYNE

Affirmed before me this 5th day of November 2024 at Detroit, WAYNE

## Declaration of Nicolette Ago

1. I am over the age of 18 years and if sworn as a witness I am competent to testify about the matters set forth herein based on personal knowledge except where the matter is indicated to be based on information and belief.
2. I reside in Royal Oak, Michigan. I have been residing in Royal Oak, Michigan for about 4 years.
3. I am a registered voter in Michigan.
4. On November 5, 2024, I went to vote at the Oakland Schools Technical Campus at 5055 Delemere Avenue in Royal Oak, Michigan around 2:00pm.
5. When I walked into the polling place, there were three individuals who were recording voters on their phones, two men and one woman. The two men wore masks that covered their faces from the nose down.
6. The three individuals were spread out across the polling place filming voters as they marked and cast their ballots.
7. While I was marking my ballot, I overheard the poll workers asking the three individuals who were filming to leave. The individuals claimed that they were permitted to film because they were part of the "media." When the poll worker asked what media company they worked for, the individuals said that they were "independent" but were nonetheless permitted to film.
8. While I was casting my ballot, I overheard a poll worker call the police.
9. After I finished my ballot, I went to go put it into the voting machine. As I approached the machine, one of the masked men was standing 4-5 feet away from me filming me.
10. The poll worker told the masked man who was filming to back up, and he refused to do so.
11. I told the masked man who was filming that he was making me uncomfortable and interfering with my right to privacy, and I asked him at least three times to back up. He refused to move.
12. After a minute or two of being repeatedly asked to back up by the poll worker and me, the masked man moved back one step. The poll worker told him to step back further and said that I had a right to privacy while I voted. The masked man responded, "You don't have a right to privacy while you're voting, I'm not moving."

13. After about three minutes, I stepped away from the polling machine with the poll worker. I had not yet cast my ballot because I felt uncomfortable and intimidated doing so while I was being recorded.
14. About two minutes later, the masked man who was recording me stepped out into the hallway. It was unclear if he moved because he was asked to do so by the police.
15. After the masked man left the room, I was able to cast my ballot without being recorded or harassed.
16. On my way out of the polling place, I told a police officer about my experience. He said that he would investigate.
17. I drove by the polling place an hour later. Police cars were still outside the building. The three individuals who were filming voters, including the individual who filmed me, were still standing outside of the polling place.
18. The entire experience of voting was extremely uncomfortable. I felt intimidated, and that my right to vote was being obstructed.
19. Due to time pressure, I was not able to give this statement in person and therefore was not able to sign a physical copy. I authorize William Ossoff, an attorney who took this statement, to sign on my behalf.

I, William Ossoff, swear and affirm that I took this statement from Nicolette Ago, read it back to her word for word, and she confirmed its accuracy.

_____/S/ William Ossoff_____
William Ossoff

## Affidavit of Lisa Feldberg

1. I am over the age of 18 years and if sworn as a witness I am competent to testify about the matters set forth herein based on personal knowledge except where the matter is indicated to be based on information and belief.
2. I reside at 555 Puritan Avenue, Birmingham, Michigan.
3. I have been residing in this address for about 13 years.
4. I am a registered voter in Michigan.
5. On November 5, 2024, I went to vote at the First Presbyterian Church, 1669 West Maple Street in Birmingham, Michigan around 1:00pm.
6. When I walked into the church there was a hallway, with a large doorway or open wall space which led into the polling room.
7. There was no line to vote when I arrived.
8. I was there with my 20-year-old daughter, and we went to fill out our ballots. I finished mine first and put the ballot in the machine.
9. Around 1:10, six people arrived in the hallway outside the polling room. I believe that five were white men and one was a woman. One of the men had an American flag bandana wrapped around his face, sunglasses, and a baseball hat.
10. The others did not have their faces covered.
11. One had a short beard and a black t-shirt and hat. One wore a green t-shirt with a beer belly and longer grey beard. One was wearing an orange construction-style vest or jacket with a backwards baseball hat with a short beard.
12. The woman was in a green t-shirt that I believe said "feeling lucky."
13. They were there with selfie sticks, sticking their phones with cameras recording video into the polling room, one of them came into the polling room itself while filming, but only by a foot or so.
14. They were all lingering as a group in the broad entry frame into the polling room.
15. They were loud and were recording around the room.

16. I looked at the poll workers and said that these folks were not allowed to be there recording this. I had worked as a poll worker four years ago, so I knew this was against the rules.
17. People had to get through this group of six people gathered at the door to go vote, they didn't prevent people from getting in but people almost had to push past to get into the room.
18. I was waiting by the door for my daughter to finish casting her ballot, at this point my son had arrived, so I was waiting for both him and my daughter to finish voting.
19. I had just stepped out in the hallway. The man who had stepped just inside the polling room then followed me out into the hallway.
20. I said, "This is why we vote."
21. The man then put his phone about a foot in front of my face.
22. I told him that he did not have permission to film me and asked him to stop.
23. He said, "Your request has been denied."
24. I must have made a face in response, because the woman in the group said, "Oh look at the reaction on her."
25. I walked back into the polling room and waited for my daughter for around six minutes, during this time they always had at least one camera on me while I waited.
26. Also during this time I heard other voters who came in ask why they were there.
27. I told the poll workers I was not comfortable walking to my car, they said that they had called the police and asked if I wanted someone to walk me out.
28. I said yes, and asked if we could go through a different door to avoid the entrance hall and to avoid being followed.
29. One of the poll workers came with me through a different hallway that led to the main exit. My son and daughter were still in the voting room, but came out shortly after.
30. My son and daughter came outside as I was walking to my car. A few people from the group came outside, I believe following another man.
31. I saw this other man recording the group, and the group then followed him to his car.

32. When they were outside, they were recording not just him, but also me walking to my car.
33. I got into the car with my daughter, my son had driven separately, and my daughter and I decided to go to the police to make sure that they know that this needs attention.
34. We went to the police station and reported this, and they said that the group of six had not done anything illegal.
35. The police said that what the group was wearing was fine and that it was a public space so they could record.
36. We told them they were recording in and outside the building and the police said that they couldn't do anything.
37. The police said that precincts 1, 2, and 3 had also gotten calls during the day.
38. The police apologized, and said there wasn't much they could do, because it was free speech in a public place.
39. I did not go back to the polling place and do not know if the police ever went the polling place.
40. Due to time pressure, I was not able to give this statement in person and therefore was not able to sign a physical copy. I authorize Stephanie King, an attorney who took this statement, to sign on my behalf.

I, Stephanie King, swear and affirm that I took this statement from Lisa Feldberg, read it back to her word for word, and she confirmed its accuracy.

_____
Stephanie King

Affirmed before me this 5th day of Nov., 2024 at Detroit, MI.
Notary public, State of Michigan, County of Wayne.
My commission expires on 05/03/2031.

_Kathryn Harney_
Notary Officer Administering Oath



N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| The American Civil Liberties Union of Michigan, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>John Does 1-6,<br><br>Defendants. | Civ. No. _____<br><br>**PROPOSED ORDER FOR EX PARTE TEMPORARY RESTRAINING ORDER AND EMERGENCY DECLARATORY AND INJUNCTIVE RELIEF** |

**ORDER**

Having considered Plaintiff's motion for a temporary restraining order and emergency declaratory and injunctive relief, the Court has determined the following:

1. Plaintiffs have a likelihood of success on the merits.

2. Plaintiffs and other eligible voters will suffer irreparable harm in the absence of a temporary restraining order.

3. The balance of equities leans in the Plaintiffs' favor.

4. The public interest favors the issuance of a temporary restraining order.

5. Plaintiffs have no adequate remedy at law.

6. This Order was entered Ex Parte due to the fact that the hearing in this matter is scheduled for _____, 2024, and absent this Order, Plaintiffs will suffer irreparable harm by being deprived of their constitutional voting rights for the November 5, 2024 general election.

Accordingly, the Court hereby ORDERS:

1. A Temporary Restraining Order is issued.

2. Defendant is ordered to cease the harassment or intimidation of voters at or outside of the polls during the November 2024 Election—including filming voters coming and going from the polls, coming within 100 feet of the entrance to any polling station or necessary points of ingress or egress from a polling station, following individuals to or from their cars to the polls, or any other form of menacing or intimation of violence while wearing a mask or otherwise.

3. This Order shall remain in full force and effect until this Court specifically orders otherwise.

4. Plaintiff must serve a copy of the pleadings in this case and this Order no later than [DATE] before [TIME] [a.m./p.m.].  Service may be provided electronically.

5. Defendant shall show cause before this Court on [DATE] at [TIME], why a preliminary or permanent injunction should not be ordered according to the terms and conditions of this temporary restraining order and as requested in Plaintiffs' Complaint.

SO ORDERED THIS 5th day of November, 2024.

_____
Hon. [NAME OF JUDGE]
United States District Judge